In re CARROZZELLA
& RICHARDSON,
Debtor.

Michael J. Daly, Trustee, Plaintiff,

v.

Zofia Deptula, Defendant.

Michael J. Daly, Trustee, Plaintiff,

v.

Mary Lou Crandall, Defendant.

Michael J. Daly, Trustee, Plaintiff,

v.

Esther Susie, Defendant.

Michael J. Daly, Trustee, Plaintiff,

v.

Robert Parisi, Defendant.

Michael J. Daly, Trustee, Plaintiff,

v.

Warren P. Corriveau, Defendant.

Bankruptcy No. 95–31231.
Adversary Nos. 96–3162, 97–3015,
97–3020, 97–3021, 97–3024.

United States Bankruptcy Court,
D. Connecticut.

Oct. 2, 2000.

Douglas S. Skalka, Neubert, Pepe & Monteith, P.C., New Haven, CT, for Movant.

Robert G. Wetmore, Robert G. Wetmore P.C., Yalesville, CT, for Respondents.

## MEMORANDUM OF DECISION ON MOTIONS FOR SUMMARY JUDGMENT

ALBERT S. DABROWSKI, Bankruptcy Judge.

### I. BACKGROUND

Before the Court are the Plaintiff–Trustee's requests for summary judgment in the captioned preferential transfer adversary proceedings. These proceedings follow in the tragic wake of a pattern of fraud perpetrated by the Debtor's principals upon their clients and others. The present Defendants, like scores of others over a period spanning two decades, entrusted significant personal funds to the Debtor's care. Due to gross mismanagement and misappropriation by certain of its partners, the Debtor law firm ended up hopelessly insolvent and in liquidation in this Court. In an effort to augment the bankruptcy estate, the Plaintiff–Trustee has commenced, *inter alia*, a series of avoidance actions against individuals, such as the present Defendants, who requested and received back from the Debtor a portion of their funds within the preferential transfer "look-back window" of Bankrupt-

cy Code Section 547(b)(4).[1] These actions have been defended on various theories; most notably a claim that the subject transfers were simply a return of funds that the Debtor had held in trust for the defendants.

Trial has been held before this Court on several of the Plaintiff's preferential transfer actions; many other such proceedings, like the ones presently at bar, have not yet reached the Court for trial. On August 18, 1999, the Court issued decisions in two of the tried preference actions. In *Daly v. Biafore (In re Carrozzella & Richardson)*, 237 B.R. 536 (Bankr.D.Conn.1999), judgment was rendered for the Plaintiff–Trustee, but in *Daly v. Radulesco (In re Carrozzella & Richardson)*, 237 B.R. 544 (Bankr. D.Conn.1999), judgment was entered for the Defendants. The Court expected that *Biafore* and *Radulesco* would serve as "channel markers" to guide and encourage the Trustee and the numerous other defendants toward fair and equitable settlements in the remaining proceedings.[2] The Court, as reflected in those companion decisions, strongly believes that justice and the law compel a distinction in outcome between defendants who used the Debtor as a contractual depository similar to a bank[3] and those who entrusted funds with the Debtor under circumstances constituting and creating a fiduciary relationship.[4]

In *Biafore* final judgment stood without appeal, but in *Radulesco* the Plaintiff–Trustee prosecuted an appeal to the Bankruptcy Appellate Panel Service of the Second Circuit[5] (hereafter, the "BAP"). On April 21, 2000, a three-judge panel of the BAP reversed this Court's decision and directed that judgment enter for the Plaintiff (hereafter, the "BAP Opinion").[6] In the BAP Opinion, the appellate panel disagreed with this Court's conclusion that in the context of preference litigation defendants should not bear the burden of "tracing" the funds which are the subject of both the Trustee's avoidance action and Defendants' "trust fund" defense. The panel also found error in this Court's "overlooking" of a presumed tenet of Connecticut law precluding the impression of a trust upon an insolvent estate.[7]

In light of the BAP Opinion, the Plaintiff is prosecuting summary judgment motions in several of the preference cases which

1. The Trustee, Michael J. Daly, Esq., commenced approximately 36 adversary proceedings in this case and the related cases of *In re Thomas J. Richardson*. Docket No. 95–31229, and *In re Carrozzella Richardson Morytko, et al.* Docket No. 95–31230.

2. "A judicial opinion informs parties of the outcome of their case and articulates the legal principles on which the opinion is based in order to guide . . . the bar." *Judicial Writing Manual* published by the Federal Judicial Center, 1991, at p. 3.

3. For example, the defendant in *Biafore* was a "sophisticated businessperson" who sought out the Debtor for investment of money. He "knew, or should have known, that the funds he placed with the Debtor were uninsured . . ." Yet "[w]ith eyes wide open, and in pursuit of a higher rate of return on idle funds . . . [he] forewent the relative security of an insured account with a banking institution." *Biafore* at 541.

4. For example, the primary defendant in *Radulesco* was "a person of advanced age and limited English language skills" who trusted and retained Attorney Carrozzella to recover delinquent support payments, and then left those proceeds in the care of the Debtor law firm upon the advice of Attorney Carrozzella. *Radulesco* at 546.

5. Bankruptcy Appellate Panel Service within the Second Circuit commenced on July 1, 1996, but was terminated by Order of the Judicial Council of the Second Circuit on June 30, 2000. During the BAP's relatively short existence within the Second Circuit, only three constituent districts—the Northern District of New York, the District of Connecticut and the District of Vermont—opted-in as full participants. The Southern District of New York and the Western District of New York provided BAP panelists but did not otherwise participate. The Eastern District of New York did not participate at all.

6. 247 B.R. 595 (2d Cir. BAP 2000).

7. This issue was not raised before this Court or, to this Court's knowledge before the BAP itself.

have not yet been reached for trial. The Plaintiff assumes that the BAP Opinion stands as binding precedent on this Court as to critical issues of law, and argues that there is no genuine issue as to any fact material to that law Yet, as detailed in this Memorandum of Decision, this Court concludes that it should regard BAP opinions as *persuasive*, but *not binding*, precedent. Thus, in light of this Court's respectful, yet profound, disagreement with certain of the BAP Opinion's conclusions of law, summary judgment will be denied in these cases since material facts remain in genuine issue.

## II. JURISDICTION

The United States District Court for the District of Connecticut has subject matter jurisdiction over the instant matters by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine these matters on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1). This is a "core proceeding" pursuant to 28 U.S.C. § 157(b)(2)(F).

## III. DISCUSSION

### A. The Role of Stare Decisis.

■ At the outset it is important for this Court to clarify an obscure, yet important, area of federal jurisdiction implicated by these proceedings. In light of the BAP Opinion, the question is presented as to the proper *stare decisis* relationship between this Court and a BAP. More specifically, this Court has reflected, and must opine upon what. If any, obligation it has to adopt the conclusions of law of the BAP Opinion as the rule of decision in adversary proceedings other than *Radulesco*.[8] Since the extant judicial authority bearing on this question is scant and without uniformity,[9] its resolution must spring from a commonsense analysis of the constitutional

and statutory framework of federal jurisdiction.

Appellate jurisdiction over bankruptcy matters is provided for in Section 158 of the United States Judicial Code, which reads in pertinent part as follows—

(a) The district courts of the United States shall have jurisdiction to hear appeals

(1) from final judgments, orders, and decrees;

(2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and

(3) with leave of the court, from other interlocutory orders and decrees;

of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving.

(b)(1) The judicial council of a circuit shall establish a bankruptcy appellate panel service comprised of bankruptcy judges of the districts in the circuit who are appointed by the judicial council in accordance with paragraph (3), to hear and determine, with the consent of all the parties, appeals under subsection (a) unless the judicial conference finds that—

(A) there are insufficient judicial resources available in the circuit; or

(B) establishment of such service would result in undue delay or increased cost to parties in cases under title 11.

\* \* \* \* \* \*

(4) If authorized by the Judicial Conference of the United States, the judi-

---

8. On May 11, 2000 the Court vacated the original August 18, 1999 Judgment in *Radulesco*, and then entered judgment in favor of the Plaintiff as directed by the BAP Opinion.

9. Neither the United States Supreme Court nor any Circuit Court of Appeals has addressed the issue.

cial councils of two or more circuits may establish a joint bankruptcy appellate panel comprised of bankruptcy judges from the districts within the circuits for which such panel is established, to hear and determine, upon the consent of all the parties, appeals under subsection (a) of this section.

(5) An appeal to be heard under this subsection shall be heard by a panel of 3 members of the bankruptcy appellate panel service, except that a member of such service may not hear an appeal originating in the district for which such member is appointed or designated under section 152 of this title.

(6) Appeals may not be heard under this subsection by a panel of the bankruptcy appellate panel service unless the district judges for the district in which the appeals occur, by majority vote, have authorized such service to hear and determine appeals originating in such district.

(c)(1) Subject to subsection (b), each appeal under subsection (a) shall be heard by a 3–judge panel of the bankruptcy appellate panel service established under subsection (b)(1) unless—

> (A) the appellant elects at the time of filing the appeal or

> (B) any other party elects, not later than 30 days after service of notice of the appeal;

to have such appeal heard by the district court.

(2) An appeal under subsections (a) and (b) of this section shall be taken in the same manner as appeals in civil proceedings generally are taken to the courts of appeals from the district courts and in the time provided by Rule 8002 of the Bankruptcy Rules.

(d) The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section.

28 U.S.C. § 158 (1999). Thus, if the circuit court has authorized and a district court has accepted, the functioning of a BAP Service, appeals from the orders of bankruptcy judges in that district are handled by a BAP *or* district judge. The BAP hears the appeal only if, in essence, all parties to the appeal consent. Otherwise, the appeal is handled by a district judge.

Against the foregoing jurisdictional background the instant litigation raises the following question: what is the precedential effect of a given BAP decision upon this Court's deliberation in a different proceeding? This inquiry is best approached by first examining the *stare decisis* effect of *district* court decisions.

 It is widely accepted that the decision of one district court judge is not binding on another district judge, even within the same district. *E.g., Threadgill v. Armstrong World Industries, Inc.,* 928 F.2d 1366 (3d Cir.1991). Logically then, a judge of the bankruptcy court—a unit of the district court, 28 U.S.C. § 151—is not bound by the decision of a single district court judge. *See City of Olathe v. KAR Development Associates L.P. (In re KAR Development Associates L.P.),* 180 B.R. 629, 640 (D.Kan.1995). To view district court decisions as binding on bankruptcy judges, but not other district judges, potentially places a bankruptcy judge in the impossible position of simultaneously following two or more conflicting district precedents.

 These principles apply with at least equal force to BAP decisions. There is no principled reason why decisions of a BAP panel should have more precedential weight than those of a district court. *Cf. Bank of Maui v. Estate Analysis, Inc.,* 904 F.2d 470, 472 (9th Cir.1990). BAP panels are composed of Article I judges whose appellate license depends entirely upon (i) the imprimatur of the Article III judges of

the district court[10] and circuit judicial council[11] and (ii) the consent of the parties to a given appeal[12]. Any suggestion that Congress' authorization of the creation of BAP Services was motivated substantially by its desire to create a uniform body of bankruptcy law within the circuits is not supported by the BAP Service's history, which instead suggests that BAPs were conceived primarily as a tool for relieving district court judges of an ofttimes undesirable and burdensome aspect of their workload. *See* Report of the Federal Courts Study Committee, Part II, Section 4.B.1.a. (1990) (impetus for 1995 amendments to 28 U.S.C. § 158; recommending expansion of BAP service to create "additional capacity within the judicial branch").

In addition, regarding BAP decisions as binding precedent would imbue the BAP with power to create a kind of provisional circuit law which would infringe the lawmaking role of the circuit courts of appeal. There is something odd and unseemly, if not unconstitutional, in the prospect of three Article I judges creating for constituent bankruptcy courts—and perhaps, district courts as well—the law[13] of one or more circuits[14] until such time as the circuit court of appeals has spoken. Simply put, if Congress had intended the decisions of an Article I court to have the same binding precedential effect as decisions of a circuit court of appeals, it needed to say so in unequivocal language. It did not, and thus this Court will regard BAP opinions as highly persuasive though not binding, precedent. This Court's specific disagreements with, and departures from, the BAP Opinion in *Radulesco* are noted in the discussion of trust law below.

### B. Summary Judgment Standards.

Federal Rule of Civil Procedure 56(c), made applicable to these proceedings by Federal Rule of Bankruptcy Procedure 7056, directs that summary judgment enter with "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." When ruling on motions for summary judgment "the judge's function is not ... to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party has the burden of showing that there are no material facts in dispute and all reasonable inferences are to be drawn, and all ambiguities resolved in favor of the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

Rule 9(c) of the Local Rules of Civil Procedure of the District of Connecticut (hereafter, "Local Rule") supplements Fed.R.Civ.P. 56 by requiring statements of material fact from each party to a summary judgment motion. The facts set forth in a movant's statement "will be deemed to be admitted unless controverted by the statement required to be served by the opposing party (4)27" Local Rule 9(c)1.

■ The Trustee annexed to the instant summary judgment motions a Local Rule 9(c)1 Statement, and the Defendants have filed a combined Local Rule 9(c)(2) Statement in response. The intersection of those Statements establishes uncontested facts which are sufficient on their face to meet the Plaintiff's burden as to the elements of a preferential transfer as found

---

10. 28 U.S.C. § 158(b)(6) (1999).

11. 28 U.S.C. §§ 158(b)(1)–(3) (1999).

12. 28 U.S.C. § 158(c)(1) (1999).

13. This lawmaking role would not be limited to bankruptcy law but would extend to any issue of law which arose in a bankruptcy appeal.

14. *See* 28 U.S.C. § 158(b)(4), authorizing multi-circuit BAPs.

in subsections (b)(1)–(5) of Bankruptcy Code Section 547,[15] but fail to establish without genuine issue that the subject transfers consisted of an "interest of the debtor in property", as required by the prefatory language of Section 547(b). Specifically, the summary judgment record does not permit the Court to find that the subject funds were the Debtor's property since they may have been placed with, and held by, the Debtor in trust for the Defendants' benefit.

## C. Trust Fund Principles.

■■ It is axiomatic that funds held in trust by one entity for another do not constitute the beneficial property of the former. Rather, title to the trust property is held by the former *as trustee* for the benefit of the latter.[16] Consequently, property transferred by a trustee to its beneficiary pursuant to, or consistent with, the trust is not voidable as a preferential transfer should the trustee later become a bankruptcy debtor. *See Begier v. Internal Revenue Service,* 496 U.S. 53, 58–59, 110 S.Ct. 2258, 110 L.Ed.2d 46 (1990). Thus, a bankruptcy court considering the voidability of transfers must initially determine whether the course of conduct between a purported trust settlor-beneficiary and his/her intended trustee created a trust rela-

tionship with respect to the subject property.

## 1. Creation of an Express Trust.

■ The Defendants claim to have had a trust relationship with the Debtor with respect to the subject funds. One such relationship is that of an express trust. An individual settlor can declare an express trust by making an *inter vivos* transfer of property to a trustee and "manifesting" an intention to create a trust.[17] *See* Restatement (Second) of Trusts §§ 2, 23 (1959); *cf. Marzahl v. Colonial Bank & Trust Co.,* 170 Conn. 62, 64, 364 A.2d 173 (1976); *Goytizolo v. Moore,* 27 Conn.App. 22, 25, 604 A.2d 362 (1992).

■ A trust may be created even though the settlor does not use the word "trust". Restatement (Second) of Trusts § 24 cmt. b (1959). And although the intention of the settlor must be "externally expressed", *id.* at § 24 cmt. c, it need not be evidenced by words, whether written or spoken. Rather, it may be discerned solely from the conduct of the settlor in light of all the circumstances. *Id.* at §§ 4 cmt. a. 24(1). In litigation such as that at bar, all circumstances throwing light upon a settlor's intention are relevant to the interpretation of his/her words and/or conduct.

---

**15.** The Plaintiff–Trustee seeks to avoid the subject transfers under the authority of Bankruptcy Code Section 547, which provides in relevant part as follows:

 \* \* \* \* \* \*

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of *an interest of the debtor in property*—
 (1) to or for the benefit of a creditor;
 (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
 (3) made while the debtor was insolvent;
 (4) made—
 (A) on or within 90 days before the date of the filing of the petition, and
 (5) that enables such creditor to receive more than such creditor would receive if—
 (A) the case were a case under chapter 7 of this title,
 (B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title . . . .
11 U.S.C. § 547 (1995) (emphasis supplied).

**16.** A trust has been generally described as "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable-duties to deal with the property for the benefit of another person . . . ." Restatement (Second) of Trusts § 2 (1959).

**17.** The intended trustee must also accept the trust, which again depends upon a manifestation of intention. Restatement (Second) of Trusts § 102 cmt. c. No particular formality is necessary to constitute an acceptance, *id.* at § 102 cmt. b; indeed, it is a question of fact in each case whether the intended trustee has manifested an intention to accept or disclaim. *Id.* at § 102 cmt. c.

*See id.* at § 24 cmt. b. In the context of alleged *attorney*-trustee malfeasance, it is also of relevance whether the purported settlor-beneficiary had an attorney-client relationship with the purported trustee, and whether the alleged trust funds were related to the legal services rendered by him. In that specific context depositors could well have harbored a reasonable expectation that the Debtor held their funds in trust since, as a general rule, whenever an attorney receives property from a client, he holds it in trust. *See* Conn. R. Prof. Conduct 1.15(a).[18] All of these circumstances are material and highly relevant, but remain in genuine issue.

## 2. Maintenance and Continuity of the Trust.

 The posture of most non-bankruptcy trust pursuit cases aligns an alleged trust beneficiary *as plaintiff,* prosecuting an action against a *defendant* alleged trustee to *recover* funds in trust. In that posture the alleged beneficiary must demonstrate not only that a trust was initially established, but also that the subject property or its proceeds *remain* in trust. In other words, the alleged beneficiary must "trace" the trust res to demonstrate that it is still subject to the trust and has not been lost or become subject to any superior rights of a third party. *See* Restatement (Second) of Trusts § 202 cmt. b (1959). This is the general rule under non-bankruptcy law, satisfaction of which becomes more difficult when the trust res is a fungible item—such as money—which has been commingled with the identical property of others.

 Nonetheless, a trustee's commingling of trust funds with non-trust funds is far from fatal to a plaintiff-beneficiary's recovery of trust property. In equity a trust pursuit does not fail where "substantial identification" of trust funds is possible. 76 Am.Jur.2d, Trusts, § 252 (1975). Substantial identification does not require the physical identification of specific coins, bills, notes, etc. *Id.* Provided the funds still exist, a beneficiary's ability to identify and recover those funds is viable despite commingling, so long as those funds can be traced into a specific mass, such as a bank account.[19] *See, id.* at § 259.

 According to the BAP Opinion, *preferential transfer defendants*—such as the Defendants here—bear the same burden of tracing funds as do plaintiffs seeking to impress a trust under applicable non-bankruptcy law. With due respect to the BAP panel in *Radulesco,* this Court believes that the legal source and unique posture of bankruptcy preference litigation substantially relieves a defendant trust fund claimant of a tracing burden. Preference defendants are not in the classic trust pursuit role of plaintiff, asking a court to recognize their beneficial rights in property *for the purpose of recovering such property.* Rather, they seek retrospective acknowledgment of those rights as a *defense* to a bankruptcy trustee's attempt to avoid a completed transfer to them from their alleged fiduciary. In other words, the defendants are using their claim of an express trust as a *shield* rather than as a *sword.* In that context—and assuming

---

18. Also relevant to this analysis is the attorney's use of banking instruments and accounting devices which are consistent with the fiduciary requirements imposed upon Connecticut attorneys when handling the monetary property of their clients. *See, e.g.,* Conn. Sup.Ct. R. §§ 2–27(a), (b), 2–28(b), Conn. R. Prof. Conduct 1.15.

19. The Court notes, with particular relevance to the instant proceedings, the practical fact that the commingling of trust funds occurs on

a regular basis when Connecticut attorneys create and maintain an IOLTA clients' funds account, as required by law. *See* Conn. R. Prof. Conduct 1.15(d), *see also,* Conn. Sup.Ct. R. § 2–28(c). The client trust funds of multiple clients are commingled within such an account, but one could not argue in good faith that the trust character of such funds is destroyed by such commingling. *Cf. Phillips v. Washington Legal Foundation,* 524 U.S. 156, 164, 118 S.Ct. 1925, 1930, 141 L.Ed.2d 174 (1998) (construing Texas law).

that an express trust was initially created—it is not appropriate that preference defendants bear a burden of tracing their funds, since by transferring funds back to the defendants on request, the debtor-trustee has essentially and presumptively "traced" the funds for the defendants. Simply put, where an express trust has been created, the debtor-trustee should be presumed to have answered the defendant-beneficiary's request for reconveyance of *trust funds* with payment of *trust funds*.[20]

### 3. The Implications of *Begier*.

The identification presumption employed by the Court here is essentially the application and/or creation of a common-law tracing rule.[21] Such a rule is analytically consistent with the United States Supreme Court's allocation and application of the tracing burden in *Begier*. Nonetheless, the BAP Opinion reads *Begier* to "implicitly reject" this Court's common-law tracing rule for preference cases. A close reading of *Begier*, however, reveals no basis for such an implication.

*Begier* explored the voidability of preference-period transfers to the IRS of so-called "trust fund taxes" from a debtor's commingled general funds. The trust involved in *Begier* was an involuntary, statutory trust rather than an express trust. The *Begier* opinion extensively reviewed and drew upon the legislative history of Bankruptcy Code § 541 and Internal Revenue Code § 7501 in fashioning a tracing rule essentially parallel to that applied by this Court in the instant cases, to wit: "[t]he debtor's act of voluntarily paying its trust-fund tax obligation ... is alone sufficient to establish the required nexus be-

tween the 'amount' held in trust and the fund paid." 496 U.S. at 66–67, 110 S.Ct. 2258.

Yet according to the BAP Opinion, because the analysis necessary to develop *Begier*'s tracing rule was "more complicated" than that required to reach this court's common-law rule, it is "reasonable to conclude that the Supreme Court implicitly rejected" this Court's viewpoint. The BAP's conclusion rests on the assumption that if this Court's general common-law tracing rule were viable, the *Begier* Court would have utilized it rather than proceed through an in-depth analysis of tax-related legislative history to arrive at the same presumption. The flaw in the BAP's analysis is its assumption that common-law tracing rules were available to the Court in *Begier*. They were not. As Justice Marshall's Opinion points out, because Internal Revenue Code § 7501 (1990)[22] "creat[ed] a trust in an abstract 'amount'—a dollar figure not tied to any particular assets—rather than in the actual dollars withheld ... [c]ommon-law tracing rules, designed for a system in which particular property is identified as the trust res, are ... unhelpful." 496 U.S. at 62–63, 110 S.Ct. 2258 (emphasis supplied).

Far from harboring negative implications for this Court's conclusions. *Begier* in fact bolsters this Court's analysis.[23] Like *Begier's* "reasonable assumption" that "any voluntary prepetition payment of trust-fund taxes out of the debtor's assets is not a transfer of the debtor's property", but rather of trust property, 496 U.S. at 67, 110 S.Ct. 2258, so too this Court's rule reasonably presumes that in transferring

---

**20.** This presumption is also recommended by, and is consistent with, Section 547(g)'s allocation to the plaintiff-trustee of the ultimate burden of proof of all elements of a preferential transfer under Section 547(b).

**21.** The common-law provides various rules or fictions to aid a trust fund claimant in tracing funds from a commingled asset pool. *See, e.g.,* 76 Am.Jur.2d, Trusts, §§ 263–268 (1975).

**22.** Section 7501 provides in relevant part that "the amount of tax ... collected or withheld shall be held to be ... special fund in trust for the United States."

**23.** This Court's conclusions also receive clear support from Justice Scalia's concurring opinion. *See Begier,* 496 U.S. at 71, 110 S.Ct. 2258 (observing that a taxpayer "identifies" trust funds when it makes payment to the taxing authority).

funds to a trust beneficiary a debtor is acting in responsible recognition of, and compliance with, its duties as trustee.

### 4. Trust Funds in an Insolvent Estate.

In reversing this Court's decision in *Radulesco*, the BAP held, alternatively, that this Court "erred by not applying controlling *Connecticut* law which prohibits a court from impressing a trust upon an insolvent estate." 247 B.R. at 600 (emphasis supplied). If through this statement the BAP Opinion intended to announce a rule that an express trust cannot be recognized as against an insolvent Connecticut bankruptcy estate (hereafter, the "Insolvency Holding"), it is untenable since such a rule plainly would have been preempted by federal law upon the enactment of the United States Bankruptcy Code. *See* 11 U.S.C. § 541(d); *cf., e.g., Begier, supra* at 59, 110 S.Ct. 2258. Even so, this Court need not reach issues of preemption since the Insolvency Holding is not even supported by the authorities cited in the BAP Opinion.

In support of the Insolvency Holding the BAP Opinion cited two decisions of the Connecticut Supreme Court: *State ex rel. Keeler v. Osborn, et al.*, 69 Conn. 257, 37 A. 491 (1897) and *McDonald v. Hartford Trust Co.*, 104 Conn. 169, 132 A. 902 (1926). This Court has carefully reviewed these decisions and, frankly stated, is at a loss to understand how the BAP's pronounced law could be gleaned from them. *Keeler* is a 19th century decedent's estate case which offers little of relevance to the present proceedings other than, ironically, to explicitly recognize a trust claimant's rights to traceable property in an insolvent estate—a basic proposition with which this Court has no disagreement. *McDonald* does, however, contain language approximating the Insolvency Holding, to wit:

It has also been held that, if the trustee's general estate has been enriched by the proceeds of trust property, the trust cannot be impressed upon the general assets where the estate is insolvent. *Lowe v. Jones*, ... 192 Mass. 94, 100, 78 N.E. 402 [ (1906) ]. ...

104 Conn. 169, 187, 132 A. 902, 908 (hereafter, the "McDonald Statement"). However, it is plain from the McDonald Statement's syntax and supporting citation that the Connecticut Supreme Court was expounding *Massachusetts*, not Connecticut, law. And even assuming the statement was one of Connecticut law, it is non-binding *dicta* since the subject decedent's estate in *McDonald* was *solvent*.[24]

Even assuming that the McDonald Statement is binding on this Court—*i.e.* it is a *holding* of *Connecticut* law, applicable to *express* trusts, and *not preempted* by federal law—its substance does not alter the conclusions of this Memorandum of Decision. When one reviews the Massachusetts law cited by *MacDonald*, it becomes apparent that the McDonald Statement is simply another way of stating the BAP Opinion's central premise—that one seeking to *impress* a trust on commingled funds of an insolvent estate must trace those funds. And for the same reasons outlined above, this Court respectfully disagrees with the BAP's conclusion that such a rule is applicable to bankruptcy preference litigation. Again, this Court believes that the unique legal source and posture of preference litigation creates a tracing presumption in favor of defendant trust fund claimants. As regards their claim of an express trust, the current preference Defendants are not asking the Court to *impress* beneficial rights in estate property; rather, they seek retrospective *acknowledgment* that those rights existed at the time of the transfers which are the subject of these adversary proceedings. By trans-

---

**24.** A third case cited by the BAP Opinion in support of the Insolvency Holding. *In re Minton Group, Inc.*, 28 B.R. 774, 785 (Bankr. S.D.N.Y.1983), is inapposite since it simply cites to *MacDonald* in the context of an attempt to *impress* a *constructive* trust, not *acknowledge* an *express* trust.

ferring alleged trust funds back to the Defendants on request, the Debtor-trustee has in essence "traced" the funds for the Defendants Logically, there is no need for a court presently to impress a trust, and for preference defendants to trace, when they are in receipt of property identified and acknowledged by a trustee as express trust property.

## IV. CONCLUSION

The critical question in these adversary proceedings is whether the funds transferred by the Debtor to the Defendants within the preference period were property of the Debtor or were trust funds being returned to beneficiaries of trusts over which the Debtor was trustee. For the foregoing reasons, the Court finds and concludes that material facts relevant to a determination of the trust nature of the subject funds remain in genuine issue. Accordingly, the pending motions for summary judgment shall be DENIED by separate orders, and a trial schedule for these proceedings shall be established.